# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# NORTHERN DIVISION

**BMO HARRIS BANK, N.A.**                                                                                  **PLAINTIFF**

**v.**                                   **Case No. 1:18-cv-00042-KGB**

**MID-ARK UTILITIES & RIG**
**SERVICES, INC.,** *et al.*                                                                 **DEFENDANTS**

## ORDER

Before the Court is an amended motion for default judgment against defendant Mid-Ark Utilities & Rig Services, Inc. ("Mid-Ark"), filed by plaintiff BHB Harris Bank, N.A. ("BHB") (Dkt. No. 30). Mid-Ark has not appeared in this action or responded to BHB's motion, and the time to respond has passed. For the reasons set forth below, the Court grants BHB's motion for default.

    **I.**     **Factual And Procedural Background**

The Court draws on the factual background already established in this case. On December 29, 2015, Mid-Ark entered into a Loan and Security Agreement (the "Agreement") with BHB in the total amount of $312,207.00 for the purchase of certain Equipment (the "Equipment") (Dkt. No. 27-4, ¶ 1). Pursuant to the Agreement, Mid-Ark agreed to make monthly payments for the purchase of the Equipment beginning on or about March 1, 2016, for a term of 60 months (*Id*., ¶ 2). Pursuant to the Agreement, Mid-Ark was obligated to pay a minimum monthly payment of $5,203.45 (*Id*., ¶ 4). Pursuant to Paragraph 5.1 of the Agreement, Mid-Ark would be in default if the "Debtor" fails to pay when due any amount owed by the "Debtor" to BHB under the Agreement (*Id*., ¶ 5). Further, pursuant to Paragraph 5.2 of the Agreement, upon default, BHB may "declare the indebtedness hereunder to be immediately due and payable." (*Id*., ¶ 6). The Agreement was signed by Mike Penney in his capacity as President of Mid-Ark (Dkt. No. 27-2, at 10).

On or about December 29, 2015, Lonnie Graham executed a Continuing Guaranty (the "Graham Guaranty") (Dkt. No. 27-4, ¶ 7). Pursuant to the Graham Guaranty, Mr. Graham agreed to the prompt payment and performance of all obligations, liabilities, and undertakings of Mid-Ark to BHB (*Id.*, ¶ 8). Mr. Graham entered into a valid written contract with BHB to induce BHB to extend credit to Mid-Ark, whereby he personally guaranteed Mid-Ark's prompt payment of all amounts owed to BHB, including all of Mid-Ark's then-existing and future obligations, debts, and liabilities to BHB (Dkt. No. 27-4, ¶ 9). By executing the Graham Guaranty, Mr. Graham guaranteed the repayment of all amounts due under the Agreement and expressly agreed, and is obligated, to pay BHB's reasonable attorney fees and cost of any action instituted upon Mid-Ark's default (*Id.*, ¶ 10). The Guaranty states that it "is an absolute and unconditional guarantee of payment and not of collectability" (Dkt. No. 27-2, at 13). On or about December 1, 2017, Mid-Ark defaulted under the terms of the Agreement by failing to make the minimum monthly payment (Dkt. No. 27-4, ¶ 11). Mr. Graham defaulted on his contractual obligations by failing to pay said amount upon Mid-Ark's default (*Id.*, ¶ 12). All of the Equipment was surrendered to BHB and then sold in a commercially reasonable manner (*Id.*, ¶ 13).

BHB commenced this action on June 4, 2018, by filing a Complaint against defendants Mid-Ark, Mr. Penney, and Mr. Graham (Dkt. No. 30-1, ¶ 4). The Summons and Complaint were served upon Mid-Ark c/o Newland and Associates, PLLC, their registered agent, on December 7, 2018 (*Id.*, ¶ 5). Mid-Ark has failed to plead or otherwise defend, and the time within which Mid-Ark may do so has expired and has not been extended (*Id.*, ¶ 6). In accordance with Federal Rule of Civil Procedure 55(a), BHB moved for entry of default as to Mid-Ark on January 9, 2019 (Dkt. No. 24). That same day, Clerk's Entry of Default was granted (Dkt. No. 25).

## II. Legal Standard

BHB now requests the entry of default judgment under Federal Rule of Civil Procedure 55(b)(2). Rule 55(b)(2) provides:

> In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to:
>
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

Fed. R. Civ. P. 55(b)(2). Federal Rule of Civil Procedure 55 contemplates a two-step process for the entry of default judgments. *Fraserside IP L.L.C. v. Youngtek Sols. Ltd.*, 796 F. Supp. 2d 946, 951 (N.D. Iowa 2011) (citation and internal quotation marks omitted). First, pursuant to Rule 55(a), the party seeking a default judgment must have the Clerk of Court enter the default by submitting the required proof that the opposing party has failed to plead or otherwise defend. *Id.* Second, pursuant to Rule 55(b), the moving party may seek entry of judgment on the default under either subdivision (b)(1) or (b)(2) of the rule. *Id.* Entry of default under Rule 55(a) must precede a grant of default judgment under Rule 55(b). *Id.*

"Entry of a default judgment . . . [is] committed to the sound discretion of the district court. Default judgments, however, are not favored by the law." *United States v. Harre*, 983 F.2d 128, 130 (8th Cir. 1993) (internal citation omitted). Once a defendant is in default, the factual allegations of the complaint, "except those relating to the amount of damages, will be taken as true." 10A Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2688.1 (4th ed. 2018) (West) (citations omitted). However, the court must ensure that the "unchallenged facts constitute

3

a legitimate cause of action" prior to entering final judgment. *See Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (quoting 10A Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 2688 (3d ed.)).

> In determining whether to enter default judgment, the Court may consider:
>
> the amount of money potentially involved; whether material issues of fact or issues of substantial public importance are at issue; whether the default is largely technical; whether plaintiff has been substantially prejudiced by the delay involved; and whether the grounds for default are clearly established or are in doubt. Furthermore, the court may consider how harsh an effect a default judgment might have; or whether the default was caused by a good-faith mistake or by excusable or inexcusable neglect on the part of the defendant.

10A Charles A. Wright, *et al.*, *Federal Practice & Procedure*, § 2685 (4th ed. 2018) (West) (citations omitted) (collecting cases). "Default judgment for failure to defend is appropriate when the party's conduct includes willful violations of court rules, contumacious conduct, or intentional delays. On the other hand, default judgment is not an appropriate sanction for a marginal failure to comply with time requirements." *Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 856 (8th Cir. 1996) (internal citations and quotation marks omitted).

### III.  Analysis

The Clerk entered default pursuant to Federal Rule of Civil Procedure 55(a) as to Mid-Ark (Dkt. No. 25). Then, BHB initially moved for default judgment against Mid-Ark on February 6, 2019, pursuant to Rule 55(b)(2) (Dkt. No. 26). This Court denied that motion without prejudice on September 3, 2019 (Dkt. No. 29). In its order, the Court explained that it denied BHB's motion for default judgment against Mid-Ark because the representations made in the motion did not square with the representations made in BHB's motion for summary judgment against Mr. Graham (*Id.*, at 7). The Court noted that, as an initial matter, BHB in its complaint sued Mid-Ark, Mr. Penney, and Mr. Graham each for the amount of $199,398.26 plus BHB's attorneys' fees, legal

4

expenses, and other costs (Dkt. Nos. 1; 29, at 7). In support of its motion for summary judgment against Mr. Graham, BHB produced the Agreement executed by Mid-Ark for the purchase and financing of the Equipment and the affidavit of Kimberly Mundt, a litigation specialist for BHB (Dkt. No. 26-2). Ms. Mundt stated that BHB requested a default judgment against Mid-Ark in the amount of $199,398.26 (*Id.*, at 3). One of the submitted documents, titled "LOAN DAMAGE CALCULATOR," established that Mid-Ark owed a principal balance of $181,756.76, repossession fees of $7,357.71, interest in the amount of $8,982.94, and late charges in the amount of $1,300.85 (*Id.*, at 12). In sum, this document established Mid-Ark's indebtedness in the total amount of $199,398.26 (*Id.*).

The Court noted that the documents submitted in support of the request for default judgment against Mid-Ark did not appear to take into account the sale of the Equipment and the subsequent application of the proceeds from that sale against the outstanding balance, as described in the documents supporting the motion for summary judgment as to Mr. Graham (Dkt. No. 29, at 8). Based upon the documents submitted in support of the motion for summary judgment, the Court was concerned that a default judgment against Mid-Ark in the amount of $199,398.26 would overstate the outstanding balance and contradict the other record evidence before the Court (*Id.*). For those reasons, the Court denied without prejudice BHB's motion for default judgment against Mid-Ark (*Id.*).

Though BHB's present motion appears identical in many respects to its previous motion for default judgment against Mid-Ark, it differs in a significant way (Dkt. Nos. 26, 30). In the present motion, BHB has submitted another affidavit from Ms. Mundt (Dkt. No. 30-2, at 1-3). In this affidavit, Ms. Mundt states that BHB requests a default judgment against Mid-Ark in the amount of $128,623.33 (*Id.*, at 3). BHB also submits another document titled "LOAN DAMAGE

5

CALCULATOR" (*Id.*, at 12). This document reports that Mid-Ark owes a principal balance of $181,756.76, repossession fees of $13,982.71, and interest of $12,625.20 (*Id.*). However, this document also accounts for the sale of the Equipment and the subsequent application of the proceeds from that sale against the outstanding balance, repossession fees, and interest (*Id.*). The document reports net equipment sale proceeds of $87,860.75 (*Id.*). The balance after accounting for the sale of the Equipment, therefore, is $120,503.92 (*Id.*). On top of this balance, the document reports interest in the amount of $4,277.89; late charges in the amount of $2,341.53; and legal expenses in the amount of $1,500.00 (*Id.*). In sum, this document establishes Mid-Ark's indebtedness in the total amount of $128,623.34[1] (*Id.*).

Thus, BHB's amended motion for default judgment corrects the deficiency the Court identified in BHB's previous motion for default judgment and the record before the Court. Based on the above factors and case law, the Court determines that default is appropriate and grants BHB's motion. As of December 1, 2017, Mid-Ark has failed to pay the amounts due and is in default under the terms of the Agreement (*Id.*, at 2). Mid-Ark has failed to appear in this action, defend against BHB's allegations, or otherwise respond to the pending motion. The Court has reviewed the factual allegations of the complaint and the language of the exhibits attached to the complaint (Dkt. No. 1). These allegations, taken as true, entitle BHB to the relief it seeks in the form of a default. For the reasons that follow, upon examination of the parties' Agreement, the

---

[1] The Court notes that the actual mathematical sum of these amounts—$120,503.92 plus $4,277.89 plus $2,341.53 plus $1,500.00—is $128,623.34. Though BHB requests a default judgment in the amount of $128,623.33 in Ms. Mundt's affidavit and lists $128,623.33 as the grand total due on the document titled, "LOAN DAMAGE CALCULATOR," the Court considers $128,623.34 to reflect accurately Mid-Ark's alleged indebtedness (Dkt. No. 30-2, at 3, 12). This sum will be used throughout as the amount BHB asserts it is owed.

Court determines that an adjustment to the amount recovered by BHB through default is necessary under controlling law.

### III. Conflict Of Laws

The Court will now address what law governs the Agreement. This is a diversity action for breach of contract (Dkt. No. 1). In determining a choice-of-law issue in a diversity action, a federal court generally looks to the choice-of-law principles of the forum state. *Chapman v. Hiland Partners GP Holdings, LLC*, 862 F.3d 1103, 1108 (8th Cir. 2017); *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 687 (8th Cir. 2001); *Simpson v. Liberty Mut. Ins. Co.*, 28 F.3d 763, 764 (8th Cir. 1994). Thus, Arkansas' choice-of-law principles govern what state's substantive law applies.[2]

Arkansas courts will enforce a contractual choice of law provision, provided that the law selected is reasonably related to the contract at issue and does not violate a fundamental public policy of the forum state. *Nursing Home Consultants, Inc. v. Quantum Health Servs., Inc.,* 926 F. Supp. 835, 841 (E.D. Ark. 1996) (collecting cases), *aff'd,* 112 F.3d 513 (8th Cir. 1997). Absent an effective contractual choice-of-law provision, Arkansas courts generally apply the "most significant relationship" test to breach of contract claims. *Fuller v. Hartford Life Ins. Co.,* 281 F.3d 704, 707 (8th Cir. 2002); *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 411 S.W.3d 184, 189 (Ark. 2012). At least one court in this district has applied the most significant relationship test where there were conflicting choice of law provisions. *See Coorstek, Inc. v. Elec. Melting*

---

[2] The Court acknowledges that BHB is a national banking association under the National Bank Act, 12 U.S.C. § 37 (1988). Its charter address and principal place of business are not in Arkansas. Regardless of whether applying Arkansas' choice-of-law principles would lead to application of Texas or Arkansas law, the interest rate which a national banking association with no charter address or principal place of business in Arkansas may charge is governed by the National Bank Act, 12 U.S.C. § 85 (1988), and is the rate allowed by the laws where the national bank is "located." *See* 12 U.S.C. § 22; *Marquette Nat'l Bank of Mpls. v. First Omaha Serv. Corp.*, 439 U.S. 299 (1978) (examining these issues); *Wiseman v. State Bank and Trust, N.A.*, 854 S.W.2d 725 (Ark. 1993) (same).

*Servs. Co., Inc.*, No. 4:06CV001726 JMM, 2008 WL 160620, at *3 (E.D. Ark. Jan. 15, 2008). The Arkansas Supreme Court identifies the following factors as relevant to determining the state with the most significant relationship: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Crisler v. Unum Ins. Co. of America*, 233 S.W.3d 658, 660 (Ark. 2006) (citing Restatement (Second) Conflict of Laws § 188).

In *Britelink, Inc. v. TeleCorp PCS, Inc.*, a court in this district held that a contractual choice of law provision that selected Virginia law was unenforceable because applying Virginia law would violate a fundamental public policy of the forum state, even though Virginia law was reasonably related to the contract at issue. No. 3:03-CV-00207 GTE, 2004 WL 5509416, at *3-4 (E.D. Ark. May 6, 2004). The court looked at a variety of issues to determine whether the state of Virginia was reasonably related, including the location of the negotiations, where the contract was executed, and where contractual obligations were performed. *Id.*, at *4-5. The court determined that Virginia was reasonably related to the contract because defendant's headquarters were in Virginia for the life of the contract, plaintiff returned the executed contract to Virginia, and the contract termination letter originated in Virginia. *Id.*, at *5.

For the second factor, the *Britelink* court first determined that Arkansas had the most significant relationship to the contract at issue, examining the types of contacts outlined in Restatement (Second) Conflicts of Law § 188. *Id.*, at *6-7. The court then compared the relevant franchise practice statutes from Virginia and Arkansas and found that Virginia law displaced the fundamental public policy concerns of the Arkansas law. *Id.*, at *8. The court reasoned that

"[a]pplying Virginia law, rather than Arkansas law, would result in a substantial loss of protection provided by [Arkansas law] for Arkansas franchisees." *Id.*, at *7.

The Agreement contains a choice-of-law provision. Paragraph 7.6 of the Agreement, titled "Governing Law/Choice of Venue," stipulates:

> Anything in this Agreement to the contrary notwithstanding, the transactions contemplated by this Agreement shall be deemed approved and entered into within the State of Texas and all credit or other financial accommodations extended by Lender under this Agreement shall be deemed extended from and subject to the laws of the State of Texas (without regard to the conflicts of law principles of such State) regardless of the location of Debtor or any of the Equipment. Any legal action or proceeding with respect to this Agreement or the transactions contemplated by this Agreement shall be brought exclusively in the federal or state courts located in the State of Texas, and Debtor accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts; *provided, however*, that nothing in this Agreement shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state in which the Equipment is located to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under this Agreement or to commence legal proceedings or otherwise proceed against Debtor in any other jurisdiction . . . .

(Dkt. No. 30-2, at 8) (emphasis in original). The Court finds no language in the Agreement that contradicts the application of Texas law. Further, Paragraph 5.3 of the Agreement, titled "Acceleration Interest," provides that Mid-Ark agreed that "upon acceleration of the . . . indebtedness" to pay "interest on all sums then owing hereunder at the rate of [1.5%] per month if not prohibited by law, otherwise at the highest rate [Mid-Ark] can legally obligate itself to pay or [BHB] can legally collect under applicable law" (*Id.*, at 7). The Court will now determine: (1) if the law selected by the parties in their Agreement is reasonably related to the contracts at issue and (2) whether that choice of law violates a fundamental public policy of the forum state.

### A. Reasonably Related

The Court will first determine if Texas law is reasonably related to the contract at issue. According to the complaint, BHB is a national banking association with its main office in Chicago,

Illinois (Dkt. No. 1, ¶ 1). Mid-Ark is a corporation organized under the laws of the state of Arkansas, with its principal place of business in Quitman, Arkansas (Dkt. No. 1, ¶ 2). The Agreement shows that Tonia Shoate, an authorized signer for BHB, signed the Agreement on BHB's behalf from an address in Irving, Texas (Dkt. No. 30-2, at 9). The Agreement also indicates that payments are to be made to this same address in Texas (*Id.*, at 5). Pursuant to the Agreement, the Collateral, when not in use, was to be kept in Quitman, Arkansas (*Id.*, at 9).

Based on the record before the Court at this time, the Court finds that Texas is reasonably related to the contract at issue because of the connection to Ms. Shoate's signing the Agreement and the designated place of payment.

### B. Violation Of Fundamental Public Policy

The Court will now determine if there would be a violation of a fundamental public policy of Arkansas if the Court applied Texas law. The Agreement stipulates that Mid-Ark is obligated to pay interest on all unpaid amounts at the rate of 1.5% per month, if not prohibited by law, otherwise at the highest rate Mid-Ark can legally obligate itself to pay or BHB can legally collect under applicable law (*Id.*, at 7). That amounts to an interest rate of 18% per year, which is the rate BHB used in the Loan Damage Calculator (Dkt. No. 30-2, at 12). Pursuant to Texas law, "if the rate computed for the . . . annualized ceiling is less than 18 percent a year, the ceiling is 18 percent a year." Tex. Fin. Code Ann. § 303.009(a) (West 2017); *see also All Seasons Window & Door Mfg., Inc. v. Red Dot Corp.*, 181 S.W. 3d 490, 498-99 (Tex. App. 2005) ("Under the optional rate ceilings, the highest amount authorized by Texas law was at least eighteen percent."). Under Arkansas law, the maximum rate of interest on contracts "shall not exceed seventeen percent (17%) per annum." Ark. Const. amend. LXXXIX, § 3; *see also In re Veg Liquidation, Inc.*, 516 B.R. 545, 553 (Bankr. W.D. Ark. 2014) (discussing Ark. Const. amend. LXXXIX, §§ 3, 6). "All

10

contracts under [Ark. Const. amend. 89, § 3] having a rate of interest in excess of the maximum lawful rate shall be void as to principal and interest . . . ." Ark. Const. amend. LXXXIX, § 6(b).

Applying Texas law, rather than Arkansas law, may result in BHB paying a higher maximum interest rate on the remainder of the loan amount than allowed by Arkansas law. Even though the notes of decisions on relevant amendments to the Arkansas State Constitution are sparse, the language of Amendment 89, § 6, explicitly states that any contract with an interest rate higher than 17% is void as to principal and interest.

The Court finds persuasive the language of Amendment 89, § 6, which enforces the maximum interest rate requirement. Based on the language of the Amendment, Arkansas has an interest in protecting Arkansas debtors from loans with high maximum interest rates, such as the maximum interest rates in the Agreement. For these reasons, the Court finds that Amendment 89 reflects a fundamental public policy which, under the facts and circumstances of this case, may not be displaced by Texas law. As a result, the Court determines that, by applying Arkansas' choice of law principles, Arkansas law applies.

### C. Arkansas Usury Law

If the interest rate in the Agreement is higher than 17%, under Arkansas law, the Agreement is void as to principal and interest. Here, the Acceleration Interest provision in the Agreement states specifically that the interest rate is 1.5% per month or the highest that Mid-Ark can legally obligate itself to pay (Dkt. No. 30-2, at 7). For the following reasons, the Court determines that this provision, when read in conjunction with other language in the Agreement and Guaranty, spares the contract under Arkansas law. The Court will construe the Acceleration Interest provision as requiring an interest rate of 17% or the highest that Mid-Ark can legally obligate itself to pay under Arkansas law.

Under Arkansas law:

> Because the "penalty for a usurious transaction is indeed heavy," the plaintiff has the burden of proving by clear and convincing evidence that the lender possessed the intent to commit usury . . . . Usury will not be presumed, imputed, or inferred where an opposite result can be fairly and reasonably reached . . . . The intent that is required, however, is not an intent to violate the law, but merely the intent to charge a rate of interest that proves to be usurious . . . . In ascertaining intent, the fact-finder must look beyond the four corners of the challenged agreement "to determine, considering all of the attendant facts and circumstances, if the contract is usurious in effect."

*Hickman v. Courtney*, 203 S.W.3d 632, 636 (Ark. 2005) (internal citations omitted).

In *Ryder Truck Rental, Inc. v. Kramer*, 563 S.W.2d 451 (Ark. 1978), the lender sued the guarantor for payment after the borrower's default; the guarantor defended against the suit arguing the principal obligation was usurious and therefore void. The Arkansas Supreme Court examined the lender's argument that "provisions of the note which state[d] that [the guarantor] guarantee[d] payment of the note with 'interest at the highest rate permitted by law' support[ed] its position" that the intent of the lender was not to impose an illegal rate of interest in the principal obligation. *Id.* at 454. Under the facts of *Kramer*, the court rejected the lender's argument, stating:

> Nor are we persuaded or convinced that [the guarantor] is precluded from asserting usury on the theory that there exists a disclaimer in that the guarantee stated that [guarantor] guarantees payment of the note with "interest at the highest rate permitted by law." It must be remembered that the quoted provision appears only in connection with the guaranty agreement and does not appear in the principal obligation between the maker and [lender]. As asserted by the [guarantor], the principal obligation having been rendered illegal and void [due to a usurious principal obligation], there is nothing for the [guarantor] to guarantee.

*Kramer*, 563 S.W.2d at 454-55.

As relevant here, BHB is suing Mid-Ark, the borrower, on the Agreement. The Agreement charges "an interest rate of 6.75% per annum based on a 360-day year of twelve 30-day months . . . ." (Dkt. No. 30-2, at 5). Further, the Agreement includes Paragraph 3.6, entitled "Maximum Interest Rate," in which the parties contractually manifested their intent to comply with applicable

usury laws, that in no event should the interest amount be permitted to exceed the maximum interest rate allowable under applicable law, and that even if the amounts due are accelerated thereby increasing the interest rate, as remedy for any alleged violation:

> (a) the Interest Amount hereunder shall be limited to the maximum amount lawfully permitted, and (b) any excess Interest Amount that may have been received shall, at Lender's option, either be credited to the unpaid principal balance of the loan as a prepayment of principal, without any prepayment fee, or refunded to Debtor, and the effective interest rate (taking into account all Interest Amounts) shall automatically be reduced to the maximum lawful rate allowed under applicable law as now or hereafter construed by a court of competent jurisdiction.

(*Id.*, at 6). A shortened version appears in Paragraph 5.3 of the Agreement which addresses default and remedies and specifically the acceleration of interest under those circumstances (*Id.*, at 7). There is no indication that, to date, Mid-Ark has been required to pay usurious interest rates.

These facts set this case apart from *Kramer*. The language at issue appears in the parties' underlying Agreement, not just the Guaranty. As a result, the Court can fairly and reasonably reach the conclusion that the parties intended from the outset that the underlying Agreement not be usurious, and the Court can reach that result by enforcing as written the contractual language of the underlying Agreement. The Court concludes that Mid-Ark is obligated to pay interest on all unpaid amounts at the rate of 17% per year.

**IV.    Damages**

Because the Court has entered default judgment, the Court now must determine the amount of damages for which Mid-Ark is liable. Once a defendant is in default, the factual allegations of the complaint, "except those relating to the amount of damages, will be taken as true." 10A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 2688.1 (4th ed. 2018) (West) (citations omitted). Under Rule 55(b)(2), the Court may hold an evidentiary hearing to determine damages, but a hearing is not required if the amount is ascertainable from definite figures, facts, and evidence

provided by plaintiffs. *Holman v. Nat'l Postal Mail Handlers Union,* 117 F.3d 1422 (8th Cir. 1997) (per curiam); *Taylor v. City of Ballwin, Mo.,* 859 F.2d 1330, 1332-33 (8th Cir. 1988); Fed. R. Civ. P. 55(b)(2) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

Pursuant to Rule 55(b), to establish damages, BHB has attached Ms. Mundt's affidavit to its motion for default judgment (Dkt. No. 30-2, at 1-3). Ms. Mundt has personal knowledge and access to records regarding Mid-Ark's loan account with BHB (*Id.*, at 1). Ms. Mundt provides with her affidavit loan damage calculations that rely on interest accruing at a rate of 18% per annum on the amounts due and owing under the Agreements as of December 1, 2017 (*Id.*, at 12).

Since BHB applied the proceeds of the sale of the Equipment to the principal balance, repossession fees, and interest, BHB calculates that the total amount that Mid-Ark owes under the Agreement is $128,623.34 as of June 19, 2018 (*Id.*). The total sum consists of the principal amount of $120,503.92, accrued and unpaid interest in the amount of $4,277.89, and late charges and other fees in the amount of $3,841.53 (*Id.*). Following the April 9, 2018, receipt of the proceeds from the sale of the Equipment and the June 19, 2018, update to the Loan Damage Calculator reflecting those proceeds, interest accrues on the principal amount at the rate of $60.25 per day (*Id.*).

However, as previously discussed, Mid-Ark is obligated to pay interest on all unpaid amounts at the rate of 17% per year. *See supra*, pp. 10-13. Since the Loan Damage Calculator assumes a per annum interest rate of 18% calculated from Mid-Ark's default on December 1, 2017, the Court must recalculate the interest accrued from that date using an annual interest rate of 17%. As of December 1, 2017, the unpaid principal balance was $181,756.76 (Dkt. No. 30-2, at 12). For the period December 1, 2017, to April 9, 2018, Mid-Ark accrued interest at an 18% annual rate, making for a daily rate of $97.87 and a total sum of $12,625.20 (*Id.*). On April 9, 2018, BHB

netted $87,860.75 in Equipment sale proceeds (*Id.*). BHB used $26,607.91 of those proceeds to offset $13,982.71 in repossession fees and $12,625.20 in interest (*Id.*). BHB applied the remaining $61,252.84 of those proceeds to the principal balance, taking Mid-Ark's outstanding principal balance from $181,756.76 to $120,503.92 (*Id.*).

However, given a 17% annual interest rate, Mid-Ark's accrued and unpaid interest calculated as of April 9, 2018, instead would have totaled $11,072.07, at a rate of $85.83 per day (*Id.*). This accounts for a difference of $1,553.13 between the cumulative interest accrued during that timeframe at an 18% rate versus a 17% rate. Therefore, accounting for this $1,553.13 difference, Mid-Ark instead should have applied $25,054.78 to the repossession fees and accrued interest and $62,805.97 to the principal balance. This change would have brought Mid-Ark's outstanding principal balance down to $118,950.79.

Thus, based on the Court's review of the record in this case, the Court finds that Mid-Ark is obligated to pay BHB $155,456.71, which equates to the total of the remaining principal amount of $118,950.79; accrued and unpaid interest in the amount of $3,988.07 for the period April 9, 2018, to June 19, 2018, at the rate of $56.17 per day; accrued and unpaid interest in the amount of $27,635.64 for the period June 20, 2018, to October 30, 2019, at the rate of $56.17 per day;[3] late charges in the amount of $3,382.21 at the rate of $260.17 per month; and legal expenses in the amount of $1,500.00.

---

[3] The Court notes that the Payment Schedule of the Agreement stipulates that for the purposes of the contract a year consists of 360 days and twelve 30-day months (Dkt. No. 30-2, at 5). Thus, in tallying the accrued and unpaid interest for the period June 20, 2018, to October 24, 2019, the Court treats June 20, 2018, through June 19, 2019, as 360 days. The Court counts the period June 20, 2019, to October 30, 2019, as 132 days.

**IV. Conclusion**

For the foregoing reasons, the Court grants BHB's amended motion for default judgment against Mid-Ark (Dkt. No. 30). When it enters judgment in this matter, the Court intends to enter judgment, supported by Ms. Mundt's affidavit and the reasoning and calculations set forth in this Order, in the amount of $155,456.71, consisting of $118,950.79 in principal balance after accounting for equipment sale, unpaid interest in the total amount of $31,623.71, late charges in the amount of $3,382.21, and legal expenses in the amount of $1,500.00.

It is so ordered, this the 30th day of October 2019.

*Kristine G. Baker*
Kristine G. Baker
United States District Judge